STATE of Kansas, ex rel. Bill
GRAVES, Governor of the
State of Kansas, Plaintiff,

v.

The UNITED STATES of America,
et al., Defendants.

No. Civ.A. 99–2341–GTV.

United States District Court,
D. Kansas.

Feb. 17, 2000.

M.J. Willoughby, John W. Campbell, Office of Attorney General, Topeka, KS, Carla J. Stovall, Kansas Attorney General, Topeka, KS, for State of Kansas, Bill Graves, plaintiffs.

Melanie D. Caro, Office of United States Attorney, Kansas City, KS, for United States of America, defendant.

Kip A. Kubin, Payne & Jones, Chtd., Overland Park, KS, James K. Logan, Logan Law Firm, LLC, Olathe, KS, for Floyd E Leonard, Charles E Wade, Julie L. Olds, Judy O. Davis, James O. Downing, Bob Woodcock, Miami Tribe of Oklahoma, defendants.

Joseph R. Colantuono, Christopher J. Reedy, Wehrman & Colantuono, LLC, Leawood, KS, for Butler National Corporation, Clark D. Stewart, defendants.

## MEMORANDUM AND ORDER

VanBEBBER, District Judge.

Plaintiff brings this action seeking review of federal defendants' agency deter-mination that a parcel of land in Kansas qualifies as Indian land under the Indian Gaming Regulation Act, 25 U.S.C. § 2703(4). Plaintiff seeks review pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* The case is before the court on plaintiff's motion for stay of agency action or temporary restraining order (Doc. 45),[1] and on defendants' motions to dismiss (Docs. 48, 50, and 56). For the reasons set forth below, the court grants plaintiff's request for a preliminary injunction and denies defendants' motions to dismiss.

## PRELIMINARY INJUNCTION

### I. Findings of Fact

This case arises from the Miami Tribe of Oklahoma's (The Tribe) proposal, in the form of a management contract, to build a class II bingo gaming facility on a parcel of land located in Kansas known as the Maria Christiana Miami Reserve No. 35 (the Reserve), and from the Tribe's request for plaintiff to enter into a gaming compact for class III casino gaming on the Reserve.

The Reserve is located inside the original boundaries of the Tribe's reservation in Kansas. In 1873, the Tribe agreed to sell its unallotted lands in Kansas; Congress legislated the purchase of the lands in 1882. In 1884, the Tribe sought reimbursement for the land allotted to, among others, Maria Christiana DeRome.[2] In essence, the Tribe claimed that the Maria Christiana allotment should be treated as unallotted land and sold to the United States. The Court of Claims agreed and compensated the Tribe for the land in 1891. In 1960, the Tribe sought interest

---

1. At a hearing on November 23, 1999, the court notified the parties that it was going to construe plaintiff's motion as one for a preliminary injunction.

2. In 1858, Congress unilaterally directed the Secretary of the Interior to add sixty-eight individuals, including Maria Christiana DeRome, to the 1854 corrected list of Indiana Miamis. The Secretary was also directed to pay each individual an amount equal to the unpaid annuity payments in accordance with the 1854 Treaty and to allot each individual 200 acres of land. Maria Christiana DeRome was one of the individuals added to the annuity rolls and allotted 200 acres. The 200–acre tract of land was reduced over time to the thirty-five acres at issue. By 1867, however, those added to the corrected list in 1858 had been removed.

on the payments made in 1891. The Court of Claims concluded that the 1858 legislation had unlawfully taken funds and land designated for the Tribe, and awarded interest on the 1891 payments. The court in *Miami Tribe of Oklahoma*, concluded from this series of events that the Tribe had unmistakenly relinquished its jurisdiction over the Reserve. *Miami Tribe of Oklahoma v. United States*, 927 F.Supp. 1419, 1426 (D.Kan.1996) (*Miami I*). Moreover, in 1873, Congress expressly abrogated the Tribe's jurisdiction, which was effective no later than 1924 when any members of the Tribe remaining in Kansas—and their heirs—became naturalized citizens.

On March 14, 1996, the Tribe admitted the land owners of the Reserve as members of the Tribe pursuant to an amendment to the Tribe's constitution. On April 16, 1996, the owners leased the Reserve to the Tribe for purposes of a gaming operation. The land owners consented to jurisdiction of the Tribe over the Reserve in the lease agreement. On June 18, 1996, after the court's ruling in *Miami I*, the Tribe resubmitted its management contract to the National Indian Gaming Commission along with evidence of the current owners' consent to jurisdiction and the newly adopted tribal amendment. The National Indian Gaming Commission requested an opinion from the Department of Interior as to whether the Reserve constituted Indian land. On May 12, 1997, the Department of Interior issued its opinion that the Reserve did not qualify as Indian land under the Indian Gaming Regulation Act. The National Indian Gaming Commission relied on the Department of Interior's opinion in disapproving the management contract. In *Miami Tribe of Oklahoma*, the Tribe sought review of the National Indian Gaming Commission's decision. *Miami Tribe of Oklahoma v. United States*, 5 F.Supp.2d 1213 (D.Kan.1998) (*Miami II*).

After the court in *Miami II* remanded the Indian land determination to the National Indian Gaming Commission, the Department of Interior conducted a site visit of the Reserve. On November 10, 1998, after previously ruling twice that the Reserve was not Indian land, the Department of Interior issued an opinion that the Reserve constituted Indian land as defined by the Indian Gaming Regulation Act. On August 23, 1999, the Tribe requested that plaintiff negotiate a class III casino gaming compact. On January 7, 2000, the National Indian Gaming Commission approved the class II gaming management contract between the Tribe and Butler National Service Corporation.

## II. Conclusions of Law

### A. Jurisdiction

■ Federal defendants contend that the court lacks jurisdiction to determine plaintiff's issues due to the doctrine of sovereign immunity. Federal defendants argue that the Quiet Title Act controls because the action involves the United States' interest in real property. *See* 28 U.S.C. § 2409a. Pursuant to the Quiet Title Act, the United States has not waived its sovereign immunity with respect to trust or restricted Indian lands, and therefore, the court lacks jurisdiction.[3] The court concludes that the Quiet Title Act does not apply because this action does not involve an interest in property traditionally involved in quiet title actions. The court further finds that even if the Quiet Title Act were to apply, the National Indian Gaming Commission's determination is reviewable because federal defendants had no rational basis for determining that the Reserve qualifies as Indian land under the Indian Gaming Regulation Act.

The Indian Gaming Regulation Act, 25 U.S.C. § 2714, provides for judicial review of agency decisions pursuant to the Ad-

---

**3.** 28 U.S.C. § 2409a(a) provides:
  The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights. This section does not apply to trust or restricted Indian lands.

ministrative Procedure Act, 5 U.S.C. § 702. The Administrative Procedure Act waives federal sovereign immunity for suits against federal officers, but it expressly confers no "authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702(2). The United States Supreme Court has rejected the contention that § 702 is a supplemental remedy to the Quiet Title Act. *See Block v. North Dakota*, 461 U.S. 273, 286 n. 22, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). In the statute of limitations context, the Supreme Court has stated that the Quiet Title Act is such an "other statute" under § 702(2) when "the QTA expressly 'forbids the relief' which would be sought under § 702." *Id.* (citing H.Rep. No. 94–1656, p. 13 (1976) (section 702 provides no authority to grant relief "when Congress has dealt in particularity with a claim and [has] intended a specified remedy to be the exclusive remedy.")).

In *Block*, the Supreme Court held that "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." *Id.* at 286, 103 S.Ct. 1811. The Ninth Circuit has "interpreted that exclusivity to mean that a plaintiff cannot avoid the Indian lands exception [of the Quiet Title Act] by obtaining jurisdiction under the Administrative Procedure Act." *Alaska v. Babbitt*, 182 F.3d 672, 674 (9th Cir.1999) (citing *Babbitt*, 38 F.3d 1068 (9th Cir.1994)). The Quiet Title Act waives sovereign immunity subject to the exception that it "does not apply to trust or restricted Indian lands." 28 U.S.C. 2409a(a). "Of course the Indian lands exception applies only if the lands at issue are Indian lands, or at least colorably so." *Babbitt*, 182 F.3d at 675. The Ninth Circuit has "repeatedly, in all of [its] analogous cases speaking to the Indian lands exception, carefully carved out an exception to the exception for cases where the claim of Indian lands is not 'colorable.' " *Id.* The "judicial inquiry extends no further than 'a determination that the government had some rationale,' and that its position 'was not undertaken in either an arbitrary or frivolous manner.' " *Id.* (quoting *Babbitt*, 38 F.3d at 1076).

■ Finding the Ninth Circuit persuasive authority on the issue, the court concludes that it has jurisdiction over this action, because the federal defendants' claim of Indian land is not "colorable." Based on the record, the court finds that federal defendants' Indian land determination lacks rationale and was undertaken in an arbitrary and frivolous manner. It is abundantly clear from the record that federal defendants misinterpreted the court's opinion in *Miami II* when they determined that the Reserve qualified as Indian land as defined by the Indian Gaming Regulation Act.

■ Prior to *Miami II*, the National Indian Gaming Commission and the Department of Interior had twice previously determined that the Reserve was not Indian land. In *Miami II*, the court considered the administrative determination that the Reserve was not Indian land. The court remanded the Indian land issue to the National Indian Gaming Commission for further proceedings because "the agency [had] failed to provide a reasoned explanation for its action [and] limitations in the administrative record [made] it impossible to conclude the action was the product of reasoned decisionmaking." *Miami II*, 5 F.Supp.2d at 1219. In remanding the Indian land issue to the National Indian Gaming Commission, the court was particularly concerned with the threshold question of whether the Tribe had jurisdiction over the Reserve. *Id.* at 1218. Though the court in *Miami I* had concluded that the history of the Reserve did not supply jurisdiction, neither the Department of Interior nor the National Indian Gaming Commission had directly addressed the Tribe's contention that jurisdiction had arisen from the land owners' new membership in the Tribe. *See id.* at 1218.

The following are relevant portions of *Miami II*:

*If jurisdiction were established,* based on these subsequent events, the court would find that the history of the parcel ... is irrelevant; *the only inquiry under the statutory definition of "Indian lands" would be whether the tribe exercises—in the present—governmental power over the land.* Thus, to the extent the NIGC and DOI conceded that jurisdiction has been satisfied here, the court believes that they considered improper factors when they cited the history of the Reserve as a basis for their decision.

"But there's the rub—*the court cannot determine whether the NIGC and DOI, in once again concluding that the Reserve is not "Indian lands," found that the Tribe still had not established jurisdiction over the Reserve.* The DOI opinion did not state specifically that jurisdiction was still lacking, but instead focused on whether the Tribe exercises governmental power."

*Miami II,* 5. F.Supp.2d at 1218 (emphasis added). The court continued:

The reference to history in the opinion may evidence an implicit argument by the NIGC and DOI that the Tribe did not assume jurisdiction over the Reserve by virtue of the owners' new membership in the Tribe. But if that is indeed the basis on which the management contract was disapproved, the decision must be overturned as arbitrary and capricious because the decision-maker has not provided a "reasoned explanation" why the Tribe cannot obtain jurisdiction in the way it has proposed. The DOI opinion's continued reliance on history seems in fact to ignore the Tribe's argument that jurisdiction exists here despite history. If the NIGC and DOI believe that jurisdiction cannot be obtained in that way, it should at least explain its reasoning in that regard.

*Id.* at 1218–19 (internal citation omitted).

After the court's remand in *Miami II,* on November 10, 1998, the Department of Interior issued an opinion that the Reserve qualified as Indian land as defined by the Indian Gaming Regulation Act, 25 U.S.C. § 2703(4). In so ruling, the Department of Interior focused only on whether the Tribe presently exercised governmental power over the Reserve and did not address the threshold question of whether the Tribe exercised jurisdiction over the Reserve, which was the very crux of *Miami II.* As evident in the November 10, 1998 opinion, the Department of Interior misconstrued the court's ruling in *Miami II* (emphasis added):

[In *Miami I,*] [t]he Court held that the record was devoid of any evidence that the current owners of the land had consented to become members of the Tribe. The Court invited the Tribe to resubmit its management contract to [the NIGC] office if these facts changed or if they could provide a more complete record. The Tribe did so and after extensive briefing on both sides of the Indian lands issue, the federal court held that events subsequent to its 1996 decision [in *Miami I* ] changed its holding. *Miami Tribe of Oklahoma v. United States,* 5 F.Supp.2d 1213 (D.Kan.1998). The Court said that new facts, such as the Tribe's recent enrollment of the landowners as members of the Tribe, *lead to a conclusion that the land is "Indian land" under IGRA if the Tribe presently exercises government power over the land.* The history of the parcel and the fact that the Tribe relinquished the land and was compensated for it by the federal government was now "irrelevant" according to the Court.

Further evidence that federal defendants misinterpreted *Miami II* is a letter from the Secretary of the Interior to Governor Bill Graves of Kansas dated December 23, 1998 (emphasis added):

This Department had previously taken the position that the land was not Indian land because of the peculiar history of the parcel. The Tribe contests that position in court, and Judge Lungstrum's decision in *Miami Tribe of Oklahoma v. United States,* 5 F.Supp.2d

1213 (D.Kan.1998) [*Miami II*], overturned our decision, *and instead focused on the governance situation today.* The court remanded the case for a fact-based determination as to whether the Tribe currently exercises government power over the land.

In *Miami II,* the court remanded the issue to the National Indian Gaming Commission because its opinion was unclear as to whether the Tribe had met the threshold requirement of having jurisdiction over the Reserve. *Miami II,* 5 F.Supp.2d at 1218–19. The Indian Gaming Regulation Act defines Indian lands as "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4)(B). However, as noted in *Miami II,* a tribe must have jurisdiction in order to be able to exercise governmental power. *Miami II,* 5 F.Supp.2d at 1217–18 ("The First Circuit has also commented on the 'exercises governmental power' requirement.... 'In addition to having jurisdiction, a tribe must exercise governmental power in order to trigger the Gaming Act.'") (quoting *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 702–03 (1st Cir.1994)). The above excerpts, however, indicate that federal defendants focused only on whether the Tribe presently exercised governmental power, without first determining if the Tribe even has established jurisdiction over the Reserve. *Miami II* clearly states that *if* jurisdiction were established, then "the only inquiry under the statutory definition of 'Indian lands' would be whether the tribe exercises—in the present—governmental power over the land." *Miami II,* 5 F.Supp.2d at 1218.

The court further has reason to believe that at least the National Indian Gaming Commission doubted whether the unilateral actions of the Tribe could establish jurisdiction. After *Miami I,* on July 1, 1996, the National Indian Gaming Commission

sent a letter to the Department of Interior requesting assistance in determining whether the Reserve qualified as Indian land. In this letter, National Indian Gaming Commission's General Counsel relayed the following:

By letter dated June 18, 1996, the Tribe requested the NIGC to reconsider its disapproval in light of the fact that the current owners of Reserve No. 35 are now members of the Tribe and pursuant to a lease with the Tribe have consented to the jurisdiction of the Tribe.... In my opinion, these recent actions of the Tribe do not have the legal effect of conferring on the Tribe jurisdiction over this tract of land. The court held that the Tribe relinquished its jurisdiction in 1884 and that Congress abrogated the Tribe's jurisdiction by the 1873 Act. In light of this ruling, it does not appear that the Tribe can unilaterally reacquire jurisdiction by merely amending its constitution, conferring membership on the current owners, and entering into a lease whereby the owners consent to the jurisdiction of the Tribe.

Based on the foregoing, the court concludes that even if the Quiet Title Act were to apply, the agency action is reviewable pursuant to the Administrative Procedure Act because federal defendants do not have a colorable claim that the Reserve is Indian land and the Indian land determination was undertaken in an arbitrary and frivolous manner. *See Babbitt,* 182 F.3d at 675 ("Of course the Indian lands exception applies only if the lands at issue are Indian lands, or at least colorably so.").

▪ Furthermore, the court concludes that federal defendants' determination is reviewable because the agency determination deprives plaintiff of its constitutional right to due process. "[T]he foreclosure of judicial review of agency action under Section 701(a) of the Administrative Procedure Act does not foreclose judicial review of any agency action that is claimed to deprive a plaintiff of his or her constitutional

rights." 14A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 3659 (3d ed.1998). In *Webster v. Doe,* the United States Supreme Court held that while the National Security Act precluded judicial review of an agency's employment decision under the Administrative Procedure Act, the discharged employee's constitutional claims were nonetheless judicially reviewable. 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). Similarly, the court concludes that even if the Quiet Title Act were to preclude judicial review of the agency action, the Indian land determination is reviewable because it deprives plaintiff of its constitutional rights. The court simply cannot conclude that this final agency determination, which may very likely deprive the State of Kansas of its property interest in exercising sovereignty, is made unreviewable by the Quiet Title Act. The court does not believe that the Quiet Title Act is meant to preclude review of agency determinations that strip a State of due process and potentially deprive the State of its property.

*B. Preliminary Injunction*

■ The court concludes that federal defendants' agency determination that the Reserve qualifies as Indian land is reviewable. The National Indian Gaming Commission's approval of the management contract on January 7, 2000, is a final agency action reviewable pursuant to the Administrative Procedure Act. *See* 25 U.S.C. § 2714. The court finds that plaintiff is an aggrieved person, as contemplated by the Administrative Procedure Act, suffering a legal wrong or adversely affected by an agency action because it may lose its right to exercise sovereignty over the land. *See* 5 U.S.C. §§ 702, 551(2). The court concludes that plaintiff's status as an aggrieved person is sufficient to create standing under the Administrative Procedure Act.

■ Pursuant to the Administrative Procedure Act, the court may, "to the extent necessary to prevent irreparable injury, . . . issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The grant or denial of a preliminary injunction is within the sound discretion of the district court and will be set aside only if the ruling is based on an error of law or constitutes an abuse of discretion. *See Kenai Oil & Gas v. Department of Interior,* 671 F.2d 383, 385 (10th Cir.1982). A preliminary injunction is the exception rather than the rule. *See GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir. 1984). "Because a preliminary injunction is an extraordinary remedy, 'the right to relief must be clear and unequivocal.'" *Chemical Weapons Working Group, Inc. v. United States Dept. of the Army,* 111 F.3d 1485, 1489 (10th Cir.1997) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir.1991)). For the court to grant a preliminary injunction, plaintiff must establish the following:

> (1) it will suffer irreparable injury unless an injunction is issued; (2) its threatened injury outweighs any harm the proposed injunction may cause to the opposing party; (3) it will likely prevail on the merits of the litigation; and (4) an injunction, if issued, would not be adverse to the public interest.

*Id.* at 1489; *Packerware Corp. v. Corning Consumer Prod. Co.,* 895 F.Supp. 1438, 1446 (D.Kan.1995).[4]

Having reviewed the record, the court finds plaintiff has established the elements necessary for a preliminary injunction. The court finds that plaintiff will suffer irreparable injury if the agency's determination has the effect of extinguishing plaintiff's right to exercise sovereignty over the land. While the balance of harms

---

4. The Tenth Circuit has adopted a modified interpretation of the likelihood-of-success requirement when the movant establishes the other three requirements. *See City of Chanute v. Kansas Gas & Elec. Co.,* 754 F.2d 310 (10th Cir.1985).

seems to be shared almost equally, any harm to plaintiff would be irreparable. The court concludes that plaintiff has established a sufficient likelihood of success on the merits, and that an injunction is not adverse to the public interest.

The court, therefore, issues a preliminary injunction and orders a stay of any further action related to gaming of any kind on the Reserve. By this preliminary injunction, the court preserves the status quo pending review of the entire record.

## MOTIONS TO DISMISS

Defendants' motions to dismiss are collectively brought pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted. Based on the foregoing discussion, the court concludes that it has subject matter jurisdiction and denies the motions to dismiss pursuant to Rule 12(b)(1). A Rule 12(b)(6) motion to dismiss will be granted only if it appears beyond a doubt that the plaintiff is unable to prove any set of facts entitling it to relief under its theory of recovery. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir.1984). The court must view all reasonable inferences in favor of the plaintiff, and the pleadings must be liberally construed. *See id.;* Fed.R.Civ.P. 8(f). The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support its claims. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Having reviewed the pleadings, the court cannot conclude that plaintiff is unable to prove any set of facts entitling it to relief and therefore denies defendants' motions to dismiss.

IT IS, THEREFORE, ORDERED that plaintiff's motion for a preliminary injunction (Doc. 45) is granted. The court hereby orders a stay of all activities relating to gaming of any kind on the Reserve and enjoins Bruce Babbitt, Secretary of the United States Department of Interior; Monte R. Deer, Chairman of the National Indian Gaming Commission, United States Department of Interior; Kevin Gover, Assistant Secretary of the Interior for Indian Affairs; Jimmie Fields, Acting Area Director of the Bureau of Indian Affairs for the Muskogee Area Office; Dan Deerinwater, Area Director of the Bureau of Indian Affairs for the Andarko Area Office; George Skibine, Director of the Indian Gaming Management Staff Office; Derril B. Jordan, Associate Solicitor for Indian Affairs; John Jasper, Associate Solicitor for Indian Affairs; Richard Schipf, National Indian Gaming Commission; Gloria Wilson, Superintendent, Miami Agency, Bureau of Indian Affairs; as well as all of the above named officers' agents, employees, and successors; and all other defendants from taking further action with respect to gaming on the Reserve pending review of the entire record and until the court issues a further order in this regard.

IT IS FURTHER ORDERED that defendants' motions to dismiss (Docs.48, 50, 56) are denied.

IT IS FURTHER ORDERED that no bond or security is required.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**