F I L E D
United States Court of Appeals
Tenth Circuit

MAY 4 2001

PATRICK FISHER
Clerk

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

STATE OF KANSAS;
BILL GRAVES, Governor
of the State of Kansas,

     Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA;
GALE A. NORTON, Secretary of
the United States Department of
the Interior, her agents, employees,
and successors; MONTE R. DEER,
Chairman of the National Indian
Gaming Commission, United States
Department of the Interior, his
agents, employees, and successors;
NATIONAL INDIAN GAMING
COMMISSION, Department of the
Interior; DEPARTMENT OF THE
INTERIOR; BUREAU OF INDIAN
AFFAIRS; INDIAN GAMING
MANAGEMENT STAFF OFFICE,
Department of the Interior; KEVIN
GLOVER, Assistant Secretary of
the Interior for Indian Affairs, his
agents, employees, and successors;
JIMMIE FIELDS, acting area director
of the Bureau of Indian Affairs for
the Muskogee area office, his agents,
employees, and successors; DAN
DEERINWATER, Area Director

Nos. 00-3057
00-3058
00-3072
00-3119

of the Bureau of Indian Affairs for the Andarko Area Office, his agents, employees, and successors; GEORGE SKIBINE, Director of the Indian Gaming Management Staff Office, his agents, employees, and successors; DERRIL B. JORDAN, Associate Solicitor for Indian Affairs, his agents, employees, and successors; JOHN JASPER, Associate Solicitor for Indian Affairs, his agents, employees, and successors; RICHARD SCHIPF, National Indian Gaming Commission; GLORIA WILSON, Superintendent of the Bureau of Indian Affairs, Miami Agency, her agents, employees, and successors; 35 ACRES OF LAND, also known as the Maria Christiana Reserve No. 35, more or less, located in Miami County, Kansas; FLOYD E. LEONARD; CHARLES E. WADE; JULIE L. OLDS; JUDY O. DAVIS; JAMES O. DOWNING; BOB WOODCOCK; MIAMI TRIBE OF OKLAHOMA; BUTLER NATIONAL SERVICE CORPORATION; CLARK D. STEWART,

Defendants-Appellants.

SAC AND FOX NATION OF MISSOURI, KICKAPOO TRIBE OF KANSAS, and PRAIRIE BAND OF POTAWATOMI INDIANS,

Amici Curiae.

2

M. J. Willoughby, Assistant Attorney General, State of Kansas, Topeka, Kansas, for Plaintiffs-Appellees.

Sean H. Donahue, Appellate Section, United States Department of Justice, Environment and Natural Resources Division, Washington D.C. (Lois J. Schiffer, Assistant United States Attorney General; Rhonda D. Harjo, Office of the Solicitor, United States Department of the Interior; Kevin K. Washburn, General Counsel, National Indian Gaming Commission; William B. Lazarus and John A. Bryson, Appellate Section, United States Department of Justice, Environment and Natural Resources Division, Washington D.C.; Jackie N. Williams, United States Attorney; Melanie D. Caro, Assistant United States Attorney, Kansas City, Kansas, with him on the brief), for Federal Defendants-Appellants United States of America, Gale A. Norton, Monte R. Deer, National Indian Gaming Commission, Department of the Interior, Bureau of Indian Affairs, Indian Gaming Management Staff Office, Kevin Glover, Jimmie Fields, Dan Deerinwater, George Skibine, Derril B. Jordan, John Jasper, Richard Schipf, and Gloria Wilson.

James K. Logan of Logan Law Firm L.L.C., Olathe, Kansas (Kip A. Kubin of Payne & Jones, Chtd., Overland Park, Kansas; Christopher J. Reedy of Colantuono & Associates, L.L.C., Leawood, Kansas, with him on the brief), for Defendants-Appellants Floyd E. Leonard, Charles E. Wade, Julie L. Olds, Judy O. Davis, James O. Downing, Bob Woodcock, Clark D. Stewart, Butler National Service Corporation, and Miami Tribe of Oklahoma.

John R. Shordike and Thomas Weathers of Alexander & Karshmer, Berkeley, California; Charley Laman, Assistant General Counsel, Kickapoo Tribe of Kansas; Mason D. Morisset of Morisset, Schlosser, Ayer & Jozwiak, Seattle Washington, filed an amicus curiae brief on behalf of Sac and Fox Nation of Missouri, Kickapoo Tribe of Kansas, and Prairie Band of Potawatomi Indians, in support of Plaintiffs-Appellees.

Before **EBEL**, **BALDOCK**, and **KELLY**, Circuit Judges.

**BALDOCK**, Circuit Judge.

These consolidated interlocutory appeals arise from a district court order granting a preliminary injunction in favor of Plaintiff State of Kansas. The order stays action on the National Indian Gaming Commission's (NIGC) decision that a tract of non-reservation land in Kansas, under lease to Defendant-Intervenor Miami Tribe of Oklahoma, constitutes "Indian lands" subject to the terms of the Indian Gaming Regulation Act (IGRA), 25 U.S.C. §§ 2701-2721. State ex rel. Graves v. United States, 86 F. Supp. 2d 1094 (D. Kan. 2000) (Miami Tribe III). Assuming other requisites of the Act are met, IGRA permits a federally recognized Indian tribe to establish gaming facilities on "Indian lands" within the tribe's jurisdiction. See 25 U.S.C. § 2710(b)(1), (d)(1)(A)(i). We have jurisdiction to review the district court's grant of a preliminary injunction under 28 U.S.C. § 1292(a)(1). We affirm and remand for further proceedings.

I.

In 1995, the Miami Tribe of Oklahoma, pursuant to IGRA, unsuccessfully requested the NIGC approve a proposed gaming management contract between the Tribe and Defendant Butler National Service Corporation. See 25 U.S.C.

4

§ 2711.[1]  If approved, the contract would have authorized the Tribe to establish Class II gaming facilities on the Maria Christiana Reserve No. 35, an undeveloped thirty-five acre tract of non-reservation land within the State of Kansas located 180 miles from the Tribe's reservation in Oklahoma.  As defined in IGRA, Class II gaming includes bingo, bingo-related games, and certain card games allowed under State law.  Id. § 2703(7).

One condition for Class II Indian gaming is that such gaming occur only on "Indian lands within such tribe's jurisdiction."  Id. § 2710(b).  In addition to reservation lands and lands held in trust by the United States, IGRA defines "Indian lands" as "any lands title to which is . . . held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."  Id. § 2703(4).  The NIGC refused to approve the gaming management contract because, in the NIGC's opinion, the Tribe did not exercise governmental power over the undeveloped tract.  Therefore, the NIGC concluded the tract encompassed under the proposed contract did not constitute "Indian lands" within the meaning of § 2703(4).

On review, the district court upheld the NIGC's decision that the tract did not constitute "Indian lands" within the meaning of IGRA.  Miami Tribe of Okla.

---

[1]  Although the NIGC is nominally a part of the United States Department of the Interior (DOI), Congress has given the NIGC exclusive authority to regulate Indian gaming conducted pursuant to IGRA.  See 25 U.S.C. §§ 2704-08.

v. United States , 927 F. Supp. 1419 (D. Kan. 1996) (Miami Tribe I). Carefully analyzing the detailed and complicated history of the tract, including applicable legislation and treaties, id. at 1424-27, the district court had "no difficulty concluding from [a] series of events that [the Tribe] unmistakably relinquished its jurisdiction over Reserve No. 35." Id. at 1426. [2]

To summarize, the court reasoned that under an 1867 treaty with the Tribe and an 1873 federal enactment affecting the Tribe, Congress "unambiguously intended to abrogate the Tribe's authority over its lands in Kansas and move the Tribe to new lands in Oklahoma." Id. The court further noted that in 1891, the United States, at the direction of the Court of Claims, compensated the Miami Tribe in the amount of $61,971 for the Kansas lands. This compensation included payment to the Tribe for the subject tract, which the Government acknowledged had been erroneously allotted by restricted fee patent around 1858 to the infant Marie Christiana DeRome, a non-member of the Miami Tribe. Id. at 1426-27. In 1960, the Miami Tribe sought interest on the 1891 compensation and secured a judgment for an additional $100,072. Id. at 1426. Based on this historical analysis, the district court concluded the Tribe had no jurisdiction over the tract, and thus necessarily exercised no governmental

---

[2] We refer the reader to the district court's opinion in Miami Tribe I for a complete recitation of those events. Miami Tribe , 927 F. Supp. at 1423-26.

6

power over the tract. Id. at 1422 (recognizing that under 25 U.S.C. § 2703(4) "a necessary prelude to the exercise of governmental power is the existence of jurisdiction").

The Tribe did not appeal the district court's conclusion in Miami Tribe I that, based on historical events, the tract did not constitute "Indian lands" under IGRA. Rather, in 1996, the Miami Tribe amended its constitution to remove the blood quantum requirement for membership in the Tribe. Subsequently, the Tribe passed an ordinance adopting the twenty-plus non-Indian owners of the tract, numerous heirs of Marie Christiana DeRome, into the Tribe. The owners in turn leased the tract to the Tribe and consented to the Tribe's exercise of jurisdiction over the tract. To provide access to the tract from the nearest public road, the tribe obtained a right-of-way road easement from an adjoining land owner. At the entrance to the tract, the Tribe placed a sign reading "Welcome to the Miami Indian Reserve in Kansas Territory established 1840."[3] The Tribe raised its flag over the tract, extended "periodic" law enforcement protection to the tract, and established a smoke shop and outreach center on the tract. With this change in circumstances, the Tribe requested the NIGC reconsider its refusal

---

[3] Under an 1840 treaty with the United States, the Miami Tribe of Indiana agreed to cede its lands in Indiana and move to lands in the federal territory of Kansas. See 7 Stat. 582. Subsequently, in 1873, the Tribe agreed to cede its lands in Kansas and move to lands in the federal territory of Oklahoma. See 17 Stat. 631.

to approve the proposed gaming management contract.

The NIGC again determined that the tract did not constitute "Indian lands" under IGRA, and again refused to approve the contract. Like the district court in Miami Tribe I, the NIGC focused largely on the history of the tract, noting that the Tribe had agreed years ago to move to Oklahoma and cede its interest in the entirety of its Kansas lands. See Miami Tribe of Okla. v. United States, 5 F. Supp. 2d 1213, 1215-16 (D. Kan. 1998) (Miami Tribe II). The NIGC did not address in detail the effect, if any, of the Tribe's leasehold over the tract or recent tribal activities on the tract. The NIGC, however, concluded that "the admission of the owners of the land into the Tribe is alone not sufficient evidence of tribal authority to bring the land within the definition of 'Indian lands' under IGRA." Id. at 1215 (internal quotations omitted). Once again, the Tribe sought review of the NIGC's decision in the district court.

This time the Tribe argued before the district court, "without reference to and despite the history of the Reserve," that the Tribe's activities with regard to the tract subsequent to Miami Tribe I established the Tribe's jurisdiction over the tract. Id. at 1218. The court in Miami Tribe II, however, declined to resolve the Tribe's argument. Rather, the court concluded that the NIGC's decision not to approve the proposed gaming management contract should be set aside as an abuse of discretion because the NIGC failed to provide a "reasoned explanation"

8

why the Tribe, in view of its recent activities, had not established jurisdiction over the tract, and did not now exercise governmental power over the tract. Id. at 1218. The court further noted that limitations in the administrative record prevented it from concluding the NIGC's decision was the product of "reasoned decisionmaking." Id. at 1219. The court cited as troublesome the NIGC's lack of reference to tribal ordinances and other activities that the Tribe asserted were examples of its exercise of jurisdiction and governmental power over the tract. The district court therefore remanded the matter to the NIGC for further proceedings related to the proposed gaming management contract. [4]

After twice previously opining that the tract did not constitute "Indian lands" under IGRA, the NIGC, on remand from Miami Tribe II, decided based on events subsequent to Miami Tribe I, that the Tribe now exercised governmental power over the tract, and that the tract did in fact constitute "Indian lands" within the meaning of IGRA. The NIGC, however, failed to specifically address the jurisdictional concerns which the district court raised in Miami Tribe II. Nevertheless, the NIGC approved the proposed Class II gaming management contract between the Tribe and Butler National, and issued a gaming permit to the Tribe. See 25 U.S.C. § 2711.

At last armed with a favorable NIGC decision, the Tribe next formally

---

[4] The State of Kansas was not a party to Miami Tribe I or II.

requested that the State of Kansas negotiate with the Tribe a gaming compact for Class III casino gaming on the Tribe's "Indian lands" in Kansas.    See id. § 2710(d).  Like Class II gaming, a condition for Class III casino gaming under IGRA is that such gaming occur only on a tribe's "Indian lands."    Id.

II.

The State of Kansas instituted this suit under the Administrative Procedure Act (APA) seeking declaratory and injunctive relief from the NIGC's decision that the thirty-five acre tract of land in Kansas constituted "Indian lands" within the meaning of IGRA.    See 25 U.S.C. § 2714 (decisions of the NIGC made pursuant to § 2710 of IGRA constitute final agency action under § 702 of the APA for purposes of appeal to the district court).  The State named as Defendants the NIGC, numerous other federal entities and officials (referred to as the Government), Butler National, and officials of the Miami Tribe.

In response, the Government filed a motion to dismiss the State's amended complaint alleging the district court lacked subject matter jurisdiction.    See Fed. R. Civ. P. 12(b)(1).  According to the Government, (1) the State of Kansas lacked standing under the APA to challenge the NIGC's decision that the tract constituted "Indian lands," within the meaning of IGRA, and (2) the Quiet Title Act (QTA),  28 U.S.C. § 2409a(a), precluded review of the tract's status as "Indian lands" under IGRA.

10

Reserving its right to claim sovereign immunity from suit, the Miami Tribe voluntarily intervened as a party Defendant for the purpose of joining the Government's challenge to the court's subject matter jurisdiction.  See Fed. R. Civ. P. 24.  In addition to adopting the Government's jurisdictional arguments, the Tribe asserted that Fed. R. Civ. P. 19 precluded federal court review because the Tribe was an indispensable party not amenable to the State's suit.  The Tribe argued that because the State's suit was in effect a suit against the Tribe, the doctrine of sovereign immunity prohibited the State from pursuing its claims.

The district court denied Defendants' motion to dismiss for lack of jurisdiction, and granted the State of Kansas' application for a preliminary injunction pursuant to Fed. R. Civ. P. 65(a).  Miami Tribe III, 86 F. Supp. 2d at 1101.  The district court rejected Defendants' jurisdictional arguments in their entirety.  The court did not address the Tribe's indispensable party argument, and thus implicitly rejected it.  As to Defendants' standing argument, the court found that "plaintiff is an aggrieved person, as contemplated by the [APA], suffering a legal wrong or adversely affected by an agency action because it may lose its right to exercise sovereignty over the land.  " Id. at 1100.  The court held that the State's status as an aggrieved party was sufficient to establish its standing under the APA.

Defendants' argument that the QTA prohibited the court's exercise of

11

jurisdiction fared no better. The district court noted that the QTA waives the sovereign immunity of the United States in quiet title actions, "subject to the exception that [the waiver] 'does not apply to trust or restricted Indian lands.'" Id. at 1097 (quoting 28 U.S.C. § 2409a(a)). The court, however, concluded that "the Quiet Title Act does not apply because this action does not involve an interest in property traditionally involved in quiet title actions." Id. at 1096. In the alternative, the court concluded that "even if the Quiet Title Act were to apply, the [NIGC's] determination is reviewable because [the NIGC] had no rational basis for determining that the Reserve qualifies as Indian land under [IGRA]." Id. The court reasoned that "'the Indian lands exception applies only if the lands at issue are Indian lands, or at least colorably so.'" Id. at 1097 (quoting State v. Babbit, 182 F.3d 672, 675 (9th Cir. 1999)).

On the merits, the court concluded that because the Tribe did "not have a colorable claim that the Reserve is Indian land," the NIGC's "Indian land determination was undertaken in an arbitrary and frivolous manner." Id. at 1099. The court criticized the NIGC's most recent decision for ignoring "the threshold question of whether the Tribe exercised jurisdiction over the Reserve, which was the very crux of Miami II." Id. at 1098. Finding the State had satisfied the elements necessary for issuance of a preliminary injunction, the court stayed "all activities relating to gaming of any kind on the Reserve." Id. at 1101. The court

12

further stayed all Defendants "from taking further action with respect to gaming on the Reserve pending review of the entire record." Id. Defendants appeal.

## III.

The penultimate issue pervading this litigation is whether the NIGC properly determined that the Kansas tract constitutes "Indian lands" within the meaning of IGRA, specifically 25 U.S.C. § 2710, for Indian gaming purposes. The NIGC's binding decision (absent judicial review) is crucial to the Miami Tribe's efforts to establish gaming facilities within the State of Kansas. Before addressing the merits of the NIGC's decision in the context of the district court's preliminary injunction, however, we must initially determine whether the court, at behest of the State, had jurisdiction to issue that injunction.

## A.

Defendants first assert that the State of Kansas has no standing under the APA to challenge the NIGC's "Indian lands" determination. According to Defendants, IGRA gives the State no stake in the NIGC's decision to issue the Miami Tribe a permit for Class II gaming on "Indian lands" within the State. Furthermore, Defendants suggest that because the State and Tribe have not yet entered into negotiations for a Class III gaming compact, no question regarding Class III gaming on the tract is properly before the court. In other words, Defendants claim the Class III gaming issue is not yet ripe for review. We

13

review questions of standing de novo. Colorado Farm Bureau v. United States Forest Serv., 220 F.3d 1171, 1173 (10th Cir. 2000).

In Miami Tribe III, the State invoked the district court's jurisdiction under the APA by way of 25 U.S.C. § 2714–the same path the Tribe took to establish jurisdiction in Miami Tribe I & II. Section 2714 of IGRA provides that "[d]ecisions made by the [NIGC] pursuant to section[] 2710 . . . of this title shall be final agency decisions for purposes of appeal to the appropriate Federal district court pursuant to the [APA]." Meanwhile, the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; see also id. § 551(2) (defining "person" to include governmental entities). Section 702 generally waives the sovereign immunity of the United States in agency review actions "seeking relief other than money damages."

To establish statutory standing under § 702 of the APA,[5] a plaintiff must first identify "final agency action." Id. § 704. Second, a plaintiff must show that such action subjects plaintiff to a "legal wrong," or "adversely affect[s]

_____

[5] Defendants do not expressly assert Article III's standing requirements as a bar to the State's suit to the extent those requirements are not encompassed within § 702's statutory standing requirements. See generally Catron County Bd. of Comm'rs v. United States Fish and Wildlife Serv., 75 F.3d 1429, 1433-34 (10th Cir. 1996).

14

or aggrieve[s]" plaintiff "within the meaning of the relevant statute." Id. § 702. The Supreme Court has interpreted § 702 to impose a prudential standing requirement: "For a plaintiff to have prudential standing under the APA, the interest sought to be protected by the complainant must be arguably within the zone of interests to be protected or regulated by the statute in question." National Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 488 (1998) (emphasis added); see also Western Shosone Bus. Council v. Babbitt, 1 F.3d 1052, 1055 (10th Cir. 1993).

Defendants do not seriously challenge the premise that the NIGC's "Indian lands" determination constitutes a "decision" made by the NIGC pursuant to § 2710, and therefore, constitutes "final agency action" reviewable under 5 U.S.C. § 702. See S. Rep. No. 100-446, at 8 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3078 ("All decisions of the [NIGC] are final agency decisions for purposes of appeal to Federal district court.") (emphasis added); see also Tamiami Partners v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1049 (11th Cir. 1995) (noting the "expansive" language of § 2714). Instead, Defendants argue that the State's claims do not fall within the "zone of interests" which Congress sought to regulate and protect in enacting IGRA. We are unpersuaded.

IGRA provides a "comprehensive framework for gaming activities on

15

Indian lands which seeks to balance the interests of tribal governments, the states, and the federal government." Pueblo of Santa Ana v. Kelly, 104 F.3d 1546, 1548 (10th Cir. 1997) (emphasis added) (internal quotations omitted). That Congress in balancing those interests chose, as Defendants claim, to give the State of Kansas no stake in the NIGC's decision to issue the Tribe a Class II gaming permit for Indian lands may well be true. But that proposition presupposes the tract constitutes "Indian lands" under IGRA–a presupposition very much in debate.

The NIGC's determination that the thirty-five acre tract of land in Kansas constitutes "Indian lands" within the meaning of IGRA, if upheld, inevitably will lead to Indian gaming on the tract. The Tribe has made its intentions to establish both Class II and III gaming on the tract unequivocally clear. Indeed, the NIGC has approved the Tribe's Class II gaming management contract with Butler National, and the Tribe has requested the State enter into negotiations for a Class III gaming compact. The NIGC's action plainly has a direct and immediate impact on the sovereign rights which the Miami Tribe, the Federal Government, and the State of Kansas exercise over the tract. See Colorado Farm Bureau, 220 F.3d at 1173. If the tract qualifies as "Indian lands," the Tribe exercises a degree of sovereignty over the tract which may allow it the right to establish gaming facilities thereon consistent with IGRA. The State in turn may not extend

16

application of its laws to the tract absent Congressional consent. <u>See</u> S. Rep. 100-446, at 5-6, <u>reprinted in</u> 1988 U.S.C.C.A.N. at 3075. [6] But if the tract does not qualify as "Indian lands," then IGRA does not apply. In that event, the State exercises a degree of sovereignty over the tract which allows it the right to prohibit gaming thereon regardless of its nature.

We are loathe to conclude that in enacting IGRA, Congress intended a State to have no say whatsoever in the largely dispositive question for Indian gaming purposes of whether a tract of land inside the State's borders constitutes "Indian lands," within the meaning of IGRA. <u>Cf</u>. <u>State ex rel. Nixon v. Coeur D'Alene Tribe</u>, 164 F.3d 1102, 1108-09 (8th Cir. 1999) (recognizing the issue of whether a tribe's internet lottery occurs on "Indian lands" as critical to the application of IGRA, and remanding to the district court for a determination in the first instance). Such a construction of IGRA would set an unwarranted

---

[6] As the Senate Report to IGRA acknowledges:

> It is a long- and well-established principle of Federal-Indian law as expressed in the United States Constitution, reflected in Federal statutes, and articulated in decisions of the Supreme Court, that unless authorized by an act of Congress, the jurisdiction of State governments and the application of state laws do not extend to Indian lands. In modern times, even when Congress has enacted laws to allow a limited application of State law on Indian lands, the Congress has required the consent of tribal governments before State jurisdiction can be extended to tribal lands.

S. Rep. No. 100-446, at 5, <u>reprinted in</u> 1988 U.S.C.C.A.N. at 3075.

17

precedent by placing the sovereign status of land within the State of Kansas wholly in the hands of the Miami Tribe and the NIGC. Surely Congress did not intend to render the State powerless to protect its sovereign interests in this situation. We conclude the State's claims in this case fall within the "zone of interests" which Congress sought to regulate and protect in enacting IGRA.

We also reject Defendants' argument that any dispute between the Tribe and the State as to Class III gaming is not yet ripe for review because compact negotiations have yet to begin. Like the Class II gaming management contract, the Tribe's ability to successfully negotiate a Class III gaming compact for the tract depends on the NIGC's favorable decision. In addition to depriving the State of sovereign rights and regulatory powers over the tract, the NIGC's decision affects the State's public policy concerns and "significant governmental interests" in Class III gaming by imposing a legal duty on the State under IGRA to negotiate a Class III gaming compact at the Tribe's request. S. Rep. 100-446, at 13, reprinted in 1988 U.S.C.C.A.N. at 3083; see also 25 U.S.C. § 2710(d). Because the NIGC's decision that the tract constitutes "Indian lands" within the meaning of IGRA has "an actual or immediately threatened effect" upon the State of Kansas and its interests, that decision is ripe for review in all respects. Lujan v. National Wildlife Fed., 497 U.S. 871, 894 (1990); see also State v. Narragansett Indian Tribe, 19 F.3d 685, 692-693 (1st Cir. 1994),

18

<u>superceded on other grounds by</u> 25 U.S.C. 1708(b).

B.

Despite our conclusion that the State of Kansas has been "adversely affected" by "final agency action" for purposes of APA review, Defendants rely on the final provision of § 702 to insist the APA does not permit review of the NIGC's decision. That provision reads in relevant part: "Nothing herein . . . affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground . . . ." 5 U.S.C. § 702.

Notably, nothing in IGRA limits judicial review of the NIGC's decision under the APA; rather § 2714 of IGRA expressly provides for such review. <u>See</u> 25 U.S.C. § 2714. Aside from IGRA, however, Defendants argue the QTA is a "limitation[] on judicial review" of the NIGC's decision within the meaning of § 702, and thus proscribes the district court's subject matter jurisdiction in this case. We review the district court's construction of federal statutes de novo. <u>United States v. 162 Megamania Gambling Devices</u>, 231 F.3d 713, 718 (10th Cir. 2000).

The QTA provides in relevant part: "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest . . . . This section

19

does not apply to trust or restricted Indian lands . . . ." 28 U.S.C. § 2409a(a).

Defendants claim that because (1) the State's action is in effect one "to adjudicate a disputed title to real property in which the United States claims an interest," and (2) the tract constitutes "restricted Indian lands," the Government has not waived its sovereign immunity from suit. Once again, Defendants are eager to presuppose the land is de jure "Indian lands." Before we turn to the question of whether the land is "restricted Indian lands" in the context of the QTA, however, we address Defendants' characterization of the State's suit as one arising under the QTA.

In Block v. North Dakota, 461 U.S. 273, 286 (1983), the Supreme Court held that "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." (emphasis added). In Kinscherff v. United States, 586 F.2d 159, 160 (10th Cir. 1978), we established that under the QTA, "[a] quiet title action may be brought by anyone claiming an interest in the real property. The interest, however, must be some interest in the title to the property." (emphasis added) (internal citation omitted). Thus, only disputes pertaining to the United States' ownership of real property fall within the parameters of the QTA. See Dunbar Corp. v. Lindsey, 905 F.2d 754, 759 (4th Cir. 1990) ("[A]ny challenge to a non-ownership interest in real property is not precluded by the QTA.").

20

In Navajo Tribe of Indians v. New Mexico, 809 F.2d 1455, 1475 (10th Cir. 1987), we explained that "adjudicating reservation boundaries is conceptually quite distinct from adjudicating title to the same lands." Similarly, adjudicating the question of whether a tract of land constitutes "Indian lands" for Indian gaming purposes is "conceptually quite distinct" from adjudicating title to that land. One inquiry has little to do with the other as land status and land title "'are not congruent concepts' in Indian law." Id. (quoting Ute Indian Tribe v. Utah, 773 F.2d 1087, 1097 (10th Cir. 1985) (en banc) (Seymour, J., concurring)). A determination that a tract of land does or does not qualify as "Indian lands" within the meaning of IGRA in no way affects title to the land. Such a determination "would merely clarify sovereignty over the land in question." Navajo Tribe, 809 F.2d at 1475 n.29.

Defendants in this case fail to appreciate the discrete concepts of land status and land title. See id. The "interest" which the State seeks to protect in this case is not an interest in the title to real property contemplated by the QTA. See Kickapoo Tribe of Indians v. Deer, No. 00-3095, 2001 WL 193810, at *1 n.4 (10th Cir. 2001) (unpublished) (stating "it is apparent" the QTA would not bar the Kickapoo Tribe's challenge to an agency determination that certain land constituted a "reservation" of the Wyandotte Tribe for purposes of IGRA). This is a dispute between federal, tribal, and state officials as to which sovereign has

21

authority over the tract.  See Solem v. Bartlett, 465 U.S. 463, 467 (1984).  The tract's owners are not even a party to this suit.

Despite Defendants' contrary protestations, the State's amended complaint does not contest ownership of the tract and does not seek to adjudicate a disputed title to the tract.  Rather, the State seeks to set aside the NIGC's decision that the land constitutes "Indian lands" for purposes of IGRA, effectively proscribing Indian gaming on the tract.  Regardless of its outcome, this lawsuit will not affect title to the tract.  Title will remain vested in the heirs of Marie Christiana DeRome.  We conclude the State's action is not one "to adjudicate a disputed title to real property in which the United States claims an interest."  28 U.S.C. § 2409a(a).  Because the action does not seek to quiet title to the tract, the QTA does not apply.  Thus, the QTA does not limit our judicial review of the NIGC's decision within the meaning of 5 U.S.C. § 702. [7]

C.

_____

[7] Because the QTA does not apply to this case, we have no occasion to address § 2409a(a)'s "restricted Indian lands" exception.  Even assuming, however, that the QTA did apply, § 2409a(a)'s "restricted Indian lands" exception would not bar our determination as to whether the subject land constituted "restricted Indian lands."  Only then could we resolve whether the exception applied and, consequently, whether the district court had jurisdiction to proceed.  That such a determination might bear upon the merits of the case is inconsequential.  A court may proceed to the merits to determine its jurisdiction.  See Land v. Dollar, 330 U.S. 731, 739 (1947);  see also Spaeth v. United States Sec'y of the Interior, 757 F.2d 937, 947-48 (8th Cir. 1985) (Henley, J., concurring).

As a final challenge to the district court's jurisdiction, the Miami Tribe claims it is a necessary and indispensable party to this lawsuit. See Fed. R. Civ. P. 19. According to the Tribe, the State's suit is in effect a suit against the Tribe which may not proceed because the Tribe, as a sovereign, is immune from suit. The district court in Miami Tribe III did not expressly address the question of the Tribe's status as a necessary and indispensable party under Rule 19. Nevertheless, because our recent decision in Sac and Fox Nation v. Norton, 240 F.3d 1250 (10th Cir. 2001), plainly forecloses the Tribe's argument, we choose to exercise our discretion to address the question in the first instance. See Enterprise Mgmt. Consultants v. United States ex rel. Hodel, 883 F.2d 890, 892 (10th Cir. 1989) (court of appeals has an obligation to raise Rule 19 issue sua sponte).

In Sac and Fox Nation, the State of Kansas, together with three federally recognized Indian tribes operating gaming facilities within the State, filed suit against the Secretary of the Interior to prevent her from (1) taking a tract of land in Kansas into trust on behalf of the Wyandotte Tribe of Oklahoma, and (2) approving gaming activities on the same land pursuant to IGRA. The district court dismissed the action pursuant to Fed. R. Civ. P. 12(b)(7) for failure to join the Wyandotte Tribe as a necessary and indispensable party. Sac and Fox Nation, 240 F.3d at 1253. We reversed. Id.

23

In concluding the Wyandotte Tribe was not a necessary party under Rule 19(a), we first reasoned that complete relief could be accorded the parties to the lawsuit: "Because plaintiffs' action focuses solely on the propriety of the Secretary's determinations, the absence of the Wyandotte Tribe does not prevent the plaintiffs from receiving their requested declaratory relief . . . ." Id. at 1258. Next, we reasoned that disposition of the action in the absence of the Wyandotte Tribe would not, as a practical matter, impair the tribe's ability to protect its interest in the subject matter of the suit:

> It is undisputed the Wyandotte Tribe has an economic interest in the outcome of this action. More specifically, the Wyandotte Tribe's ability to conduct gaming activities on the . . . tract will survive only if all the Secretary's determinations regarding the . . . tract are upheld. The potential of prejudice to the Wyandotte Tribe's interests is greatly reduced, however, by the presence of the Secretary as a party defendant. As a practical matter, the Secretary's interest in defending h[er] determinations is "virtually identical" to the interests of the Wyandotte Tribe.

Id. at 1259. Finally, we reasoned that nothing in the record indicated the absence of the Wyandotte Tribe would likely subject the parties to the action to multiple or inconsistent obligations. Id.

We also concluded that "even assuming, arguendo, the Wyandotte Tribe could be considered a necessary party under Rule 19(a)," the tribe was not an indispensable party under Rule 19(b). Id. We reiterated that although the tribe had an economic interest in the suit's outcome, the Secretary's presence in the

24

suit largely offset the potential for prejudice to the tribe. Because the potential for prejudice was minimal, we did not consider the availability of means for lessening or avoiding prejudice. Id. at 1259-60. We further reasoned that a judgment rendered in the tribe's absence would be adequate because plaintiffs' claims turned "solely on the appropriateness of the Secretary's actions." Id. at 1260. Finally, we noted the lack of any alternative forum to hear plaintiffs' claims.

We believe our Rule 19 analysis in Sac and Fox Nation controls our resolution of the Miami Tribe's Rule 19 argument here. Like its claims in Sac and Fox Nation, the State of Kansas' claims in this case focus on the propriety of an agency decision that the tract qualifies for Indian gaming under IGRA. Thus, the absence of the Miami Tribe does not prevent the State from obtaining its requested relief or an adequate judgment. Nor do we believe the absence of the Tribe is likely to subject the parties to this action to multiple or inconsistent obligations. Finally, and most importantly, the potential for prejudice to the Miami Tribe is largely nonexistent due to the presence in this suit of not only the NIGC and other Federal Defendants, but also the tribal officials and Butler National. These Defendants' interests, considered together, are substantially similar, if not identical, to the Tribe's interests in upholding the NIGC's

25

decision. [8]  Accordingly, we reject the Miami Tribe's claim that it is a necessary and indispensable party to this action under Fed. R. Civ. P. 19.   [9]  Having concluded the district court had jurisdiction to issue a preliminary injunction in favor of the State of Kansas, we now turn to a discussion of the elements necessary to support the court's issuance of that injunction.

IV.

We review the grant of a preliminary injunction for an abuse of discretion. ACLU v. Johnson , 194 F.3d 1149, 1155 (10th Cir. 1999).  "An abuse of discretion occurs only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling."  Hawkins v. City and County of Denver , 170 F.3d 1281, 1292 (10th Cir. 1999) (internal quotations omitted).  To obtain a preliminary injunction under

---

[8] In its appellate brief, the Tribe describes   Sac and Fox Nation   as "on all fours" with this case.  That, of course, was before we reversed the district court's decision on appeal.  We continue to believe, however, that   Sac and Fox Nation  is "on all fours" with this case for purposes of resolving the Rule 19 issue.

[9] The Tribe's reliance on   Enterprise Mgmt. Consultants  , 883 F.2d at 890, is misplaced.  In that case, an aggrieved management contractor filed suit against officials of the DOI and the Citizen Band Potawatomi Tribe of Oklahoma to enforce a proposed gaming management contract of which both the Government and the Tribe disapproved.  The State was not a party to the proceedings.  We upheld the district court's dismissal of the suit because the Tribe was an indispensable party immune from suit.   Id. at 892-94.  Notably in this case, the State of Kansas does not seek to enforce a gaming management contract to which the Tribe is a party.  Rather, the State's suit challenges an administrative decision holding that the tract constitutes "Indian lands" under IGRA.

26

Fed. R. Civ. P. 65(a), the moving party bears the burden of showing (1) the injunction, if issued, would not adversely affect the public interest, (2) irreparable harm would occur unless the injunction issues, (3) the threatened injury outweighs any harm an injunction may cause the opposing party, and (4) the party has a substantial likelihood of success on the merits. ACLU, 194 F.3d at 1155. [10]

## A.

We have little difficulty concluding in this case that the State of Kansas has satisfied the first, second, and third elements required for issuance of a preliminary injunction. First, three federally-recognized Kansas Indian tribes presently operate gaming facilities within the State. We are unaware of any substantial public interest which maintaining that status, at least for a short while longer, might adversely affect.

Second, because the State of Kansas claims the NIGC's decision places its sovereign interests and public policies at stake, we deem the harm the State stands to suffer as irreparable if deprived of those interests without first having a full and fair opportunity to be heard on the merits. See Kiowa Indian Tribe v. Hoover, 150 F.3d 1163, 1171-72 (10th Cir. 1998) (interference with tribe's

---

[10] Because of its limited appearance to contest jurisdiction, the Miami Tribe takes no position on the underlying merits of the district court's preliminary injunction.

sovereign status sufficient to establish irreparable harm). We are well aware of the Government's claim that the State has overstated its sovereign interests in the tract because, according to the Government, the tract is a "restricted Indian allotment" constituting "Indian country." If the tract constitutes "Indian country," the State's jurisdiction over it admittedly is limited. See DeCoteau v. Dist. County Court, 420 U.S. 425, 427 n.2 (1975); see also Mustang Prod. Co. v. Harrison, 94 F.3d 1382, 1385 (10th Cir. 1996) ("Indian country encompasses those areas that have been validly set apart for the use of the Indians as such, under the superintendence of the Government.") (internal quotations omitted) (emphasis added). But to resolve this case, we need not decide the precise extent of the State's jurisdiction over the tract. We decline to unnecessarily confront the issue of whether the tract is a "restricted Indian allotment" separate and apart from the "Indian lands" inquiry squarely at issue in this case. See Narragansett Indian Tribe, 19 F.3d at 701 (refusing to address the precise attributes of Indian sovereignty over land in determining the applicability of IGRA). We believe the State of Kansas' interests in adjudicating the applicability of IGRA, and the ramifications of such adjudication, are sufficient to establish the real likelihood of irreparable harm if the Defendants' gaming plans go forward at this stage of the litigation.

Third, we believe the threatened injury to the State outweighs any harm

28

the preliminary injunction might cause the Government. We are mindful that the Miami Tribe, its officials, and Butler National desire to begin constructing a gaming facility and reaping its economic benefits on a tract of land the Tribe claims as its own. These Defendants will be entitled to proceed with their plans, however, only if the tract qualifies as "Indian lands" under IGRA. The answer to this question will affect the sovereign rights and regulatory powers of all involved. Accordingly, we now discuss whether the State has established a substantial likelihood of success on the merits.

B.

Because the merits of this case involve review of the NIGC's decision that the tract constitutes "Indian lands" of the Tribe within the meaning of IGRA, the APA review principles enunciated in Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984) apply. A federal court may not set aside an agency decision unless that decision fails to meet statutory, procedural or constitutional requirements, or is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)-(D); see Sac and Fox Nation, 240 F.3d at 1260-1261. Thus, to establish a likelihood of success on the merits, the State of Kansas must demonstrate a basis under the APA for setting aside the NIGC's decision.

For the Kansas tract to qualify as "Indian lands" of the Miami Tribe within

29

the meaning of IGRA, (1) the Tribe must have jurisdiction over the tract, (2) fee title to the tract must be restricted or not freely alienable, and (3) the Tribe must exercise governmental power over the tract.     See 25 U.S.C. §§ 2703(4)(B), 2710(b)(1), (d)(1)(A)(i).  Unfortunately, IGRA sheds little light on the question of whether under the present circumstances the tract constitutes "Indian lands" of the Miami Tribe.  Where, as here, Congress has not "directly spoken to the precise question at issue," a court is required to uphold the agency's interpretation "if it is based on a permissible construction of the statute." Chevron , 467 U.S. at 842-43.  Notwithstanding this deferential review standard, the agency "must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. . . . Normally, an agency . . . [decision] would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.     , 463 U.S. 29, 43 (1983) (internal citations and quotations omitted).

In remanding the "Indian lands" question to the NIGC, the Miami Tribe II court was particularly concerned with the threshold question of whether the Tribe had jurisdiction over the tract.     Miami Tribe II , 5 F. Supp. 2d at 1218.  After the court in Miami Tribe II reversed the NIGC's decision that the tract was not "Indian lands" for purposes of IGRA, federal officials conducted a site visit to

30

the tract. Subsequently, after twice ruling the tract was not "Indian lands," the NIGC concluded that the tract was "Indian lands" of the Miami Tribe subject to IGRA. Rather than focusing on the Tribe's jurisdiction over the tract, however, the NIGC's decision focused solely on whether the Tribe presently exercised governmental power over the tract. Miami Tribe III, 86 F. Supp. 2d at 1097-99.

The NIGC's failure to thoroughly analyze the jurisdictional question in its most recent decision likely renders its conclusion that the tract constitutes "Indian lands" within the meaning of IGRA arbitrary and capricious. See Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574-76 (10th Cir. 1994) (discussing arbitrary and capricious standard). In concluding that the Tribe exercised governmental power over the tract without first establishing the Tribe's jurisdiction over the tract, the NIGC, in effect, put the cart before the horse. We agree with the Miami Tribe I court that before a sovereign may exercise governmental power over land, the sovereign, in its sovereign capacity, must have jurisdiction over that land. Miami Tribe I, 927 F. Supp. at 1423 ("Absent jurisdiction, the exercise of governmental power is, at best, ineffective, and at worst, invasive."); see also Narragansett Indian Tribe, 19 F.3d at 701 (recognizing that "jurisdiction is an integral aspect of retained sovereignty"). A proper analysis of whether the tract is "Indian lands" under IGRA begins with the threshold question of the Tribe's jurisdiction. That inquiry, in turn,

31

focuses principally on congressional intent and purpose, rather than recent unilateral actions of the Miami Tribe.

"Congress possesses plenary power over Indian affairs, including the power to . . . eliminate tribal rights." South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343 (1998). Congress also has the power to create tribal rights within a State without the State's consent. Thus, an Indian tribe may not unilaterally create sovereign rights in itself that do not otherwise exist. An Indian tribe retains only those aspects of sovereignty not withdrawn by treaty or statute. United States v. Wheeler, 435 U.S. 313, 323 (1978) (noting that specific treaty provisions or unilateral action by Congress may alter a tribe's sovereign rights).

The most probative evidence of congressional intent and purpose in this case is the language of the legislation and treaties which the State of Kansas suggests (and Miami Tribe I held) eliminate the Miami Tribe's sovereign rights over the tract. See Yankton Sioux Tribe, 522 U.S. at 344; see also Solem, 465 U.S. at 470-71 (language of cessation together with unconditional compensation from Congress present "an almost insurmountable presumption" that a tribe's land was diminished). To a lesser extent, we may also consider events occurring within a reasonable time after passage of these laws and treaties to discern congressional intent. "Congress' own treatment of the affected areas, particularly in the years immediately following the opening [of the land to individual

32

settlement], has some evidentiary value, as does the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with [the land]." Solem, 465 U.S. at 471; see also DeCoteau 420 U.S. at 442-49 (disregarding post-1960 tribal activities and a DOI opinion treating land as "Indian country" where the plain language of an 1889 agreement between the Federal Government and tribe indicated otherwise).

The difficulty with the Government's position is that the district court in Miami Tribe I thoroughly analyzed the question of the Tribe's jurisdiction over the tract based upon the United States' treatment of the tract. The court concluded that no lawful basis existed to suggest the Tribe presently had jurisdiction over the tract. Miami Tribe I, 927 F. Supp. at 1424-27; see supra, at 5-7. Rather, Congress years ago " unambiguously intended to abrogate the Tribe's authority of its lands in Kansas and move the Tribe to new lands in Oklahoma." Miami Tribe I, 927 F. Supp. at 1426 (emphasis added).

The court in Miami Tribe III summarized the Miami Tribe I court's findings and conclusions with regard to the Marie Christiana Reserve No. 35:

> The Reserve is located inside the original boundaries of the Tribe's reservation in Kansas. In 1873, the Tribe agreed to sell its unallotted lands in Kansas; Congress legislated the purchases of the lands in 1882. In 1884, the Tribe sought reimbursement for the land allotted to, among others, Maria Christiana DeRome. In essence, the Tribe claimed that the Maria Christiana allotment should be treated as unallotted land and sold to the United States. The Court of Claims agreed and compensated the Tribe for the land in 1891. In

33

1960, the Tribe sought interest on the payments made in 1891.  The Court of Claims concluded that . . . 1858 legislation had unlawfully taken funds and land designated for the Tribe [including Reserve No. 35], and awarded interest on the 1891 payments.  The court in [Miami Tribe I] concluded from this series of events that the Tribe has unmistakably relinquished its jurisdiction over the Reserve. Moreover, in 1873, Congress expressly abrogated the Tribe's jurisdiction [over its former lands in Kansas], which was effective no later than 1924 when any members of the Tribe remaining in Kansas–and their heirs– became naturalized citizens.

Miami Tribe III , 86 F. Supp. 2d at 1095-96.

Because the Tribe did not appeal Miami Tribe I, the district court's findings and conclusions regarding the status of the tract, including its construction of the relevant legislation and treaties, are now res judicata and we need not revisit them here. [11]  Notably, none of the Defendants have ever challenged Miami Tribe I's findings and conclusions regarding the status of the tract.  Rather, they rely solely on the Tribe's activities subsequent to Miami Tribe I to claim tribal jurisdiction over the tract–namely (1) the Tribe's adoption of the tract's twenty-plus owners into the Tribe, (2) those owners' consent to tribal jurisdiction pursuant to a lease with the Tribe, and (3) the Tribe's recent development of the tract.  None of these recent events, however, alters the conclusion that Congress abrogated the Tribe's jurisdiction over the tract long

---

[11]  Although the State of Kansas was not a party to Miami Tribe I, the principles of res judicata do not require that one be a party to prior litigation to invoke them in subsequent litigation.    See Clough v. Rush , 959 F.2d 182, 187 (10th Cir. 1992).

ago, and has done nothing since to change the status of the tract. An Indian tribe's jurisdiction derives from the will of Congress, not from the consent of fee owners pursuant to a lease under which the lessee acts. We conclude the State of Kansas has a substantial likelihood of success on the merits of this cause. [12]

Accordingly, the preliminary injunction of the district court is AFFIRMED. The cause is REMANDED for further proceedings not inconsistent with this opinion.

---

[12] We need not address the restricted status of the tract to uphold the district court's preliminary injunction. Nevertheless, we recognize that aspect of the "Indian lands" issue presents demanding questions as well. To be sure, the 1859 fee patent to the tract, under which the present owners hold title as heirs of Maria Christiana DeRome, is restricted on its face indicating the fee may not be conveyed without the consent of the DOI. The DOI continues to consider the fee restricted and treats it as such. In 1872, however, Kansas passed a joint resolution purporting to remove restrictions on the alienability of the Kansas reserves. Kansas Joint Resolution (approved March 1, 1872) (available through the Kansas State Historical Society, 6425 SW 6th Ave., Topeka, KS 66615). Congress approved that resolution on January 23, 1873, in "An Act Authorizing the Removal of Restrictions Upon the Alienation of Certain Miami Indian Lands in the State of Kansas." 17 Stat. 417. In Miami Tribe I, the district court commented that "Reserve No. 35's restricted status . . . does not arise from any lingering traces of [the Tribe's] sovereignty, but rather from the terms of the United States' conveyance of the property to Maria Christiana DeRome." Miami Tribe I, 927 F. Supp. at 1426 n.5. We leave a detailed analysis of this problem to another day.